10 F.3d 1363, 1366 (9th Cir. 1993); *Gutierrez-Centro v. INS*, 99 F.3d 1529, 1535 (9th Cir. 1996); and *Jara-Navarette v. INS*, 813 F.2d 1340 (9th Cir. 1987).

While these cases do urge the consideration of all relevant factors, they focus on the scope of inquiry that an Immigration Judge must undertake once the seven years of physical presence requirement has already been met. The cases that the petitioner cites do not support her position that the Board may not rest its decision to deny suspension of deportation solely on an alien's failure to meet the physical presence requirement.

The plain language of section 244 indicates that seven years of physical presence is a necessary requirement for a discretionary grant of suspension of deportation. It states that the Attorney General may grant a suspension of deportation to an alien who meets the physical presence requirement "and" is a person of good moral character "and" whose deportation would cause extreme hardship. *See* 8 U.S.C. § 1254 (a) (1994). Congress' use of the word "and," makes it clear that all three requirements must be met. Since Ashki has not met the first requirement she is not eligible for a suspension of deportation under section 244. "As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach." *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam). Accordingly, the Board did not abuse its discretion in failing to consider eligibility requirements that could not have affected the ultimate resolution of Ms. Ashki's application for suspension of deportation.

### IV. CONCLUSION

For the reasons set forth above, we affirm the Board of Immigration Appeals' order dismissing Ms. Ashki's motion to reopen deportation proceedings.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0406P (6th Cir.)
File Name: 00a0406p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————



MAHIN ASHKI,

      *Petitioner,*

    *v.*

IMMIGRATION AND
NATURALIZATION SERVICE,
      *Respondent.*

No. 99-3857

On Petition for Review of an Order of the
Board of Immigration Appeals.
No. A24 653 394.

Submitted: September 15, 2000

Decided and Filed: December 4, 2000

Before: JONES, SILER, and CLAY, Circuit Judges.

———————

### COUNSEL

**ON BRIEF:** Gretchen M. Wolfinger, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondent. Mahin Ashki, Lexington, Kentucky, pro se.

## OPINION

JONES, Circuit Judge. Petitioner, Mahin Ashki, challenges a final order of the Board of Immigration Appeals ("Board" or "BIA") denying her motion to reopen deportation proceedings for the purpose of applying for suspension of deportation pursuant to section 244 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254 (1994). For the reasons set forth below, we affirm the Board's order.

### I.  FACTS

Mahin Ashki is a forty-one year old native and citizen of Iran. She first entered the United States on October 4, 1976 and reentered on August 7, 1984 on a valid non-immigrant student visa. In October 1984, Ms. Ashki married John Evans Yurko, a United States citizen. Shortly thereafter, Yurko filed an "immediate relative petition" on his wife's behalf. On the same day, Petitioner filed an application to adjust her status with the Immigration and Naturalization Service. The petition and application were denied when the immigration judge determined that the marriage was a sham. Ms. Ashki was issued an order to show cause why she should not be deported ("order to show cause") on August 18, 1986.

On or about March 24, 1987, Petitioner applied for relief of asylum and withholding of deportation before an immigration judge. On October 7, 1987, the immigration judge found Petitioner deportable and denied her applications for asylum and withholding of deportation. In September 1996, Mahin Ashki filed a motion with the Board of Immigration Appeals ("Board" or "BIA") to reopen her deportation proceedings for the purpose of applying for suspension of deportation pursuant to INA § 244. The Board found that Ms. Ashki was not eligible for suspension of deportation because she had not been "continuously present in the United States for seven years immediately preceding the date of her application."

discretionary relief from deportation. As the Fourth Circuit pointed out in *Appiah v. INS*,

> Eligibility for suspension is not a right protected by the Constitution. Suspension of deportation is rather an "act of grace" that rests in the "unfettered discretion" of the Attorney General. Because suspension of deportation is discretionary, it does not create a protectible liberty or property interest. This is true even where the state "frequently" has granted the relief sought. 202 F.3d at 704 (citing *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996) and *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)).

The Eleventh Circuit and the Fifth Circuit have reached this same conclusion. *See Tefel v. Reno*, 180 F.3d at 1301; *Gonzalez-Torres v. INS*, 213 F.3d 899, 903 (5th Cir. 2000). Although we are not bound by the holdings of our sister circuits, we find their reasoning persuasive. Therefore, we hold that NACARA does not violate Ms. Ashki's right to Due Process under the 5th Amendment of the U.S. Constitution.

### D.  Abuse of Discretion

The Board of Immigration Appeals' decision to deny Petitioner Ashki's motion to reopen was based solely on her failure to meet the physical presence requirement. The Board stated, "because the lack of requisite physical presence is dispositive, we need not consider whether the respondent has met the other statutory requirements for suspension of deportation." (Order of the Board of Immigration Appeals, dated June 7, 1999). This Court reviews the Board's denial of a motion to reopen deportation proceedings for abuse of discretion. *See INS v. Doherty*, 502 U.S. 314, 323 (1992); *see also Watkins v. INS*, 63 F.3d 844 (9th Cir., 1995); *Arrozal v. INS*, 159 F.3d 429, 432 (9th Cir. 1998).

Petitioner asserts that the Board of Immigration Appeals abused its discretion because it "failed to consider all factors when weighing equities and denying relief." She cites *Arrozal,* 159 F.3d at 432 (9th Cir. 1998); *Yepes-Prado v. INS*,

this fact does not make these exemptions irrational. There are a myriad of political and foreign policy reasons that might explain why aliens from certain nations were initially encouraged to stay in the U.S. and later exempted from the stop time provision and other aliens were not. Petitioner has offered no evidence that the Congressional exemptions were irrational or that they were based on an impermissible motivation. Therefore, this court will not second guess the line that Congress has drawn.[2] *See Fiallo,* 430 U.S. at 798; *see also Appiah*, 202 F.3d at 710; *Afolayan,* 219 F.3d at 789.

## 2. Due Process

Ms. Ashki also asserts that NACARA violates Due Process because it deprives her of her right to a fair hearing. Ashki claims that her hearing was unfair because NACARA applied a different standard to her than it applies to similarly situated aliens who belong to one of the exempted nationalities. However, in order to demonstrate that the Due Process Clause has been violated, Petitioner must establish that she has been deprived of a life, liberty, or property interest sufficient to trigger the protection of the Due Process Clause in the first place. *See Board of Regents v. Roth*, 408 U.S. 564, 569 (1972).

Ms. Ashki has not asserted any constitutionally protected interest. As an illegal alien she is deportable on the basis of her failure to obey United States immigration laws and has no right to stay in the United States. Furthermore, Ashki has no constitutionally-protected liberty interest in obtaining

---

[2] It is worth noting that the "stop time" provision itself also passes rational basis review. As the Eleventh Circuit held in *Tefel v. Reno*, "Congress intended the stop- time rule to eliminate the incentive to prolong deportation proceedings in order to become eligible for suspension. *See, e.g.,* H.R. Rep. No. 104-879 (1997) ("suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued"). Certainly removing the incentive for delay in the deportation process is a legitimate government objective." 180 F.3d 1286, 1299.

---

Specifically, the Board held that the "stop time" provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) as amended by the Nicaraguan Adjustment and Central American Relief Act of 1997 (NACARA) prevented Ms. Ashki from fulfilling the seven-year residence requirement because this provision dictates that her progress toward this goal was arrested when she was issued an order to show cause on August 18, 1986. The Board concluded that since Ashki had only been "continuously present" in the U.S. for a little more than two years when the order to show cause was issued, she had not fulfilled the seven-year residence requirement. Accordingly, the Board denied her motion to reopen and entered a final order of deportation on June 7, 1999. Mahin Ashki appealed the Board's final order to this Court.

## II. STANDARD OF REVIEW

We review the Board's denial of a motion to reopen deportation proceedings for abuse of discretion. *See INS v. Doherty*, 502 U.S. 314, 323 (1992); *see also Watkins v. INS*, 63 F.3d 844, 847 (9th Cir. 1995); *Arrozal v. INS*, 159 F.3d 429, 432 (9th Cir. 1998). Questions of law involved in this deportation proceeding are reviewed *de novo*. *Gjonaj v. INS*, 47 F.3d 824, 826 (6th Cir. 1995).

## III. ANALYSIS

### A. Legislative Background

Prior to 1996, section 244(a) of the Immigration and Nationality Act (INA) gave the Attorney General broad discretion to grant suspension of deportation to illegal aliens. *See* 8 U.S.C. § 1254(a) (1994) (repealed 1996). However, the Attorney General's discretion was not complete. In order to be eligible for suspension of deportation under § 244(a), an alien was required to prove that: (1) he had been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, (2) that during this period he was and is a person of good moral character, and (3) that he is a person whose

deportation would, in the opinion of the Attorney General, result in extreme hardship . . . . *Id*. One of the defects of this regime was that it encouraged illegal aliens to draw out their deportation proceedings so that they could fulfill the seven-year residence requirement and apply for suspension of deportation. H.R. Rep. No. 104-469 (I) (1996).

On September 30, 1996, President Clinton signed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) into law. Pub. L. 104-208, 110 Stat. 3009-546. This act was designed to expedite the removal of deportable aliens and to limit their ability to obtain discretionary relief from deportation. H.R. Rep. No. 104-469 (I) (1996). Accordingly, the IIRIRA section 304 (a) repealed the "suspension of deportation" authority set out in INA section 244 and replaced it with a more limited form of discretionary relief called "cancellation of removal" found in INA section 240A. 8 U.S.C. § 1229b (Supp. III 1997). The order to show cause that had previously been used to initiate deportation was replaced with the notice to appear. *Id*. § 1229(a)(1).

IIRIRA also changed the method for calculating an alien's period of continuous physical presence. *Id*. § 1229b(d)(1). Section 304(a) amended INA section 240A to provide that: "any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear . . . ." *Id*. This change was specifically designed to eliminate the problem of aliens delaying their deportation proceedings until they could establish the seven years of continuous presence that was required for suspension of deportation. H.R. Rep. No. 104-469 (I) (1996).

Most of the changes set forth in IIRIRA went into effect on April 1, 1997 and were not retroactive. Pub. L. 104-208, 110 Stat. 3009-625. However, IIRIRA section 309(c)(5), "Transitional Rules With Regard to Suspension of Deportation," took effect immediately upon enactment [September 30, 1996] and seemed to be retroactive. 110 Stat. at 3009-627.

*Rodriguez v. United States*, the Eleventh Circuit held that statutes which discriminate within the class of aliens comport with the Due Process Clause of the Fifth Amendment (and the equal protection principles it incorporates) so long as they satisfy rational basis scrutiny. 169 F.3d 1342, 1349 (1999); *see also Appiah,* 202 F.3d at 704, 710 (4th Cir. 2000) citing *Matthews v. Diaz* 426 U.S. 67, 78-80 & n. 13 (1976). In the case of *In re Longstaff*, the Seventh Circuit held that, Congress can bar aliens from entering the United States for "discriminatory and arbitrary reasons." *In re Longstaff*, 716 F.2d 1439, 1442 (7th Cir. 1983).

Under rational basis scrutiny, a statute is "accorded a strong presumption of validity" and will be upheld if "any reasonably conceivable state of facts" could demonstrate that the statute is rationally related to a legitimate government purpose. *Heller v. Doe*, 509 U.S. 312, 319-320 (1993). As Justice Kennedy observed in *Heller v. Doe*, "[a] classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.' The problems of government are practical ones and may justify, if they do not require, rough accommodations . . . ." *Heller*, 509 U.S. at 321 (citing *Metropolis Theater Co. v. Chicago,* 228 U.S. 61, 69-70) (citations omitted).

Given this deferential standard of review, the NACARA exemptions easily withstand constitutional challenge. Congress passed the NACARA exemptions in order to protect aliens who the government had encouraged to stay in the United States from the changes to the suspension of deportation rules made in the IIRIRA. *See* 143 Cong. Rec. S12,261 (daily ed. Nov. 9, 1997) (statement of Sen. Abraham). These exemptions were granted for diplomatic reasons and so that the United States would not violate its earlier understandings with these particular groups of aliens. *Id*.

Although the NACARA exemptions clearly do not cover all aliens who will face hostile conditions in their homelands,

In her brief, Ashki contends the NACARA exemptions should receive intermediate scrutiny because "illegal aliens" need additional protection due to "their powerless nature." Petr. Br. at 9. In support of this proposition she cites *Plyler v. Doe*, in which the Supreme Court struck down a Texas statute that denied educational benefits to illegal alien children. 457 U.S. 202 (1982). However, the Supreme Court's holding in *Plyler* does not apply to the case at bar. Unlike *Plyler*, which involved distinctions that the State of Texas made between aliens and non-aliens, the instant case concerns distinctions that the federal government has made among aliens.

While heightened scrutiny may be applied to distinctions that individual states make regarding aliens, the Supreme Court has made it clear that the scope of judicial inquiry is considerably more narrow when the federal government takes action in the area of immigration and naturalization. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). This deference is based on the Court's understanding that "the power to expel or exclude aliens" is "a fundamental sovereign attribute" and that this power is most appropriately "exercised by the government's political departments." *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953). As Justice Powell explained in *Fiallo v. Bell*,

> decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary, and the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.
> *Fiallo,* 430 U.S. 796 (citing *Matthews v. Diaz* 426 U.S. 67, 81-82 (1976)).

Thus, distinctions made by the federal government among aliens receive only rational basis scrutiny. For example, in

Unfortunately, the language of this section was not perfectly clear on the issue of whether the new "stop time" provision should be applied retroactively. Section 309(c)(5), which stated that the "stop time" provision "shall apply to notices to appear issued before, on, or after the date of enactment of this Act," was especially problematic. *Id*. Although this section made it clear that the new "stop time" provision applied to *notices to appear* issued *before* the date of enactment of IIRIRA, it did not indicate whether the "stop time" provision would apply retroactively to *orders to show cause*. This omission left the act open to conflicting interpretations. Some commentators argued that the "stop time" provision could not be retroactive since it only applied to notices to appear which did not even exist until IIRIRA was enacted. Others alleged that Congress had intended for the stop time provision to apply retroactively and that although the transitional rules did not explicitly mention orders to show cause, the "transitional rules" impliedly included them. In the *Matter of N-J-B-*, the BIA took the latter position by interpreting the phrase "notices to appear" to encompass all charging documents initiating deportation/removal proceedings, including orders to show cause. *See In re N-J-B-*, Int. Dec. 3309 (BIA 1997).

On November 19, 1997, Congress enacted the Nicaraguan Adjustment and Central American Relief Act (NACARA), Pub. L. No. 105-100, 111 Stat. 2160. This act codified the BIA's decision in *N-J-B-* by amending the "transitional rules" in section 309(d)(5) of IIRIRA. As amended, IIRIRA section 309(c)(5) stipulates that:

> paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to *orders to show cause . . .* issued before, on, or after the date of enactment of this act.
> NACARA § 203 (a), 111 Stat. at 2196 (emphasis added).

NACARA removed any ambiguities that may have previously existed in IIRIRA section 309(c)(5), making it clear that the

"stop time" provision set forth in INA section 240A(d)(1) and (2) applies in the cases of aliens who where issued orders to show cause before, on, or after IIRIRA's September 30, 1996 enactment date.[1]

This interpretation of NACARA has been endorsed by the United States Courts of Appeals for the Fourth, Fifth, Eighth, and the Eleventh Circuits. *See Appiah v. INS*, 202 F.3d 704, 708 (4th Cir. 2000); *Gonzalez-Torres v. INS*, 213 F.3d 899, 902-903 (5th Cir. 2000); *Afolayan v. INS*, 219 F.3d 784, 786 (8th Cir. 2000); *Tefel v. Reno*, 180 F.3d 1286, 1289-90 fn. 3, 4 (11th Cir. 1999). It is also supported by the Board of Immigration Appeals' decision in the case of *In re Nolasco*, Int. Dec. 3385 (BIA 1999) (en banc).

## B. Petitioner's Statutory Claims

As noted above, the Board of Immigration Appeals applied the "stop time" provision to Ms. Ashki's case. The Board concluded that since she had only been in the United States for a little over two years when a order to show cause was issued against her she had not fulfilled the seven-year residence requirement of § 244 and was not eligible for suspension of deportation.

Ms. Ashki contends that the "stop time" provision should not be applied in her case because the literal language of IIRIRA's original transitional rules, section 309(c)(5), states that the "stop time" provision in INA section 240A "shall apply to *notices to appear*." Ashki argues that since she was served with a order to show cause and not a notice to appear

---

[1]This interpretation is supported by an explanatory statement of NACARA issued by the Senate Appropriations Committee which states: Section 203 modifies certain transition rules established by IIRIRA with regard to suspension of deportation and cancellation of removal. The changes state that the "stop time" rule established by that Act in section 240A of the INA shall apply generally to individuals in deportation proceedings before April 1, 1997. *See In re Nolasco*, Int. Dec. 3385 at 10 (quoting 143 Cong. Rec. S12660, available in 1997 WL 712581).

this "stop time" provision does not reach her and that she is therefore eligible for the suspension of deportation.

Although Ms. Ashki's construction of the "transitional rules" may have been plausible prior to the passage of NACARA, that act has foreclosed this interpretation. As noted above, NACARA amended IIRIRA's "transitional rules." In doing so, Congress clearly indicated that the new "stop time" provision applies retroactively to orders to show cause. Accordingly, the Board of Immigration Appeals did not err in applying the stop time provision to Ms. Ashki's case.

## C. Petitioner's Constitutional Claims

While the passage of NACARA ensured that IIRIRA's "stop time" provision would generally be applied retroactively, the act also exempted certain aliens from the "stop time" provision. For example, NACARA section 202 allows Nicaraguans and Cubans who have been present in the United States since December 1, 1995 to apply to adjust their status to lawful permanent residence (independent of the new stop time rule). *See* NACARA § 202. In addition, NACARA section 203 amended the transition rules in IIRIRA section 309(c)(5) to exempt certain nationalities from the retroactive application of the "stop time" rule discussed above. The nationals exempted include those of El Salvador, Guatemala, the Soviet Union (or its successor republics), Latvia, Estonia, Lithuania, Poland, Czechoslovakia, Romania, Hungary, Bulgaria, Albania, East Germany, and Yugoslavia (or its successor states). *See* NACARA § 203(a)(1).

### 1. Equal Protection

Petitioner claims that the NACARA exemptions violate the Equal Protection Clause because they give aliens from certain nations access to suspension of deportation even though these individuals may be "similarly situated" to non-exempted aliens. The first step in assessing Ms. Ashki's equal protection claim is to determine the level of scrutiny that this Court should apply to the NACARA exemptions.